Application of WILMINGTON SUBURBAN WATER CORPORATION and DELAWARE WATER CORPORATION for Changes in Rates in Accordance with Sec. 151, Title 26, *Delaware Code.*

(*June* 14, 1965)

(Reargument Denied June 30, 1965)

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

*Joseph T. Walsh,* and *J. Parker Connor,* Washington, D. C., for appellant, Delaware Public Service Commission.

*David F. Anderson,* of Berl, Potter & Anderson, for appellees, Wilmington Suburban Water Corporation and Delaware Water Corporation.

Supreme Court of the State of Delaware, No. 1314, 1962.

WOLCOTT, Chief Justice.

This is an appeal from the Superior Court sitting in review of a rate application before the Public Service Commission (hereafter "Commission"). From the order of the Commission the two utilities involved, Wilmington Suburban Water Corporation (hereafter "Wilmington") and Delaware Water Corporation (hereafter

"Delaware") appealed to the Superior Court. The Superior Court affirmed the Commission in part, reversed the Commission's finding as to administrative and general expenses of the companies, and remanded to the Commission for further proceedings the determination with respect to each company of rate base, rate of return, amounts of working capital required, and the amount of interest paid by Wilmington. See *Wilmington Suburban Water Corporation,* Del., 203 A.2d 817. From this decision the Commission appeals to this Court. The companies did not appeal.

Wilmington and Delaware are public utilities supplying water to industrial, commercial and residential customers in northern New Castle County. Wilmington operates the facilities owned by it as well as those owned by Arden Water Co. It obtains a substantial part of the water supplied by it to its customers by purchase from Delaware, which also supplies customers other than Wilmington. Obviously, if Delaware's rates are increased Wilmington would necessarily be forced to increase its rates by reason of the increased cost of the water obtained by it from Delaware. Accordingly, the separate rate increase applications of Delaware and Wilmington were consolidated before the Commission for simultaneous decision.

The appeal brings before us six questions only. These may be stated as follows:

1. In determining the rate base for these companies was it proper for the Commission to deduct from the trended cost value of the companies' properties an amount for supersession?

2. In determining the rate base for these companies was it proper for the Commission to deduct from the trended cost value of the companies' properties accumulated depreciation determined by the precise depreciation reserve of the companies?

3. In determining the rate base for Wilmington did the Commission allow sufficient cash working capital?

4. Did the Commission establish a proper rate of return which, applied to the rate base, would give the companies sufficient income?

5. Did the Commission correctly determine a proper amount of operating expenses of the companies?

6. Was the method used by the Commission in establishing the average debt of Wilmington proper?

We will dispose of the questions raised by the Commission in the order in which they have been stated. In so doing, we will refer to the facts* in the record as required. Before doing so, however, we make some observations applicable especially to appeals in public utility rate cases.

Rate-fixing by the Commission is primarily a legislative function. The Commission does not act as a judicial or quasi-judicial tribunal. On the contrary, it acts as litigant, lawyer and judge in the initial determination of the matter before it. On appeal from its decision it appears before the reviewing court as a litigant in support of its own decision and, indeed, it initiated the present appeal. By reason of the nature of the Commission's function, courts have been given broad powers of review of its decisions and are required to examine the evidence before the Commission and the reasoning on which its findings are based. Of course, considerable weight must be given to the Commission's findings, especially on disputed factual questions, but the power of a reviewing court is clear to overturn any Commission finding when it is either not supported by sufficient evidence or is the result of faulty reasoning. *Diamond State Telephone Company*, 1 Storey 525, 149 A.2d 324.

26 *Del. C.* Sec. 155, requires the Commission to fix "just and reasonable" rates to be charged by a public utility. The rates so fixed shall be such as to yield a fair return to the utility upon the

---

*For a fuller factual statement, see 203 A.2d 817.

present fair value of the property dedicated to public use. A fair return to the utility is defined as sufficient earnings to enable the utility to pay its operating expenses, to attract new capital for expansion purposes, and to pay a fair return to its stockholders. Generally speaking, the fixed rates should be such as to insure a profit to the utility sufficient to induce the investment of private capital. *Diamond State Telephone Company,* 10 Terry 203, 113 A.2d 437.

26 *Del. C.* Sec. 126, governs the establishment of the present fair value of the utility's property to which a rate of return may be applied to determine the maximum permissible earnings of the company. In determining the present fair value of the utility's property the Commission in its judgment decides two important questions, viz., (1) the weight to be given to any or all of the different elements of value set out in Sec. 126 and required to be considered in determining fair value, and (2) whether or not the rates fixed by the Commission will produce a reasonably fair and just return upon the fair value of the property. *Diamond State Telephone Company,* 10 Terry 203, 113 A.2d 437. Included within the latter question is the further question of what is a reasonable rate of return to the utility.

It is thus apparent that three considerations enter into the fixing of rates, none of which is absolutely controlling. Thus, the fairness of the income to be yielded by the established rates must be tested by applying the approved rate of return to the present fair value in order to determine whether the anticipated income exceeds the limits of fairness. Similarly, the correctness of the findings of fair value or rate of return must be tested by a comparison of the anticipated income obtained by applying the rate of return to the fair value with the actual dollar income required by the utility to pay its operating expenses, attract capital for future expansion, and pay a fair return to stockholders. No one element is absolutely controlling. All must yield in the last analysis to the requirement that the utility be permitted to earn enough to operate in a manner fair to it and to the consuming public.

The Commission received testimony upon the fair value of the.

companies' properties based upon book cost, original cost, trended cost at 1961 prices, and trended cost at an average of 1957–61 prices.

With respect to Delaware the values thus arrived at varied in the case of Delaware's witnesses from a low of approximately $3,030,000 based upon original cost to a high of $5,990,000 based upon trended cost at 1961 prices. In the case of the State's witnesses the values varied from a low of approximately $2,840,000 based upon original cost to a high of approximately $4,090,000 based upon trended cost at 1961 prices.

The difference in estimated values springs primarily from differences placed by the witnesses in their opinions as to the proper amounts to be charged as accumulated depreciation, but above all by an allowance made for supersession by the State's witnesses. For example, with respect to trended cost at 1961 prices supersession was allowed at $1,311,000.

The Commission fixed the fair value of Delaware at $3,365,000.

With respect to Wilmington the values thus arrived at varied in the case of Wilmington's witnesses from a low of approximately $2,225,000 based upon book cost to a high of approximately $3,358,000 based upon trended cost at 1961 prices. In the case of the State's witnesses the values varied from a low of approximately $1,950,000 based upon book cost to a high of approximately $2,830,000 based upon trended cost at 1961 prices.

The difference in these estimated values also springs primarily from differences placed by the witnesses in their opinions as to the proper amounts to be charged as accumulated depreciation, but above all by an allowance made for supersession by the State's witness. For example, with respect to trended cost at 1961 prices supersession was allowed at $442,000.

The Commission fixed the fair value of Wilmington at $2,363,000.

We turn now to the specific points raised by the Commission in the appeal.

## 1. *Supersession*

The Commission in arriving at the fair rate base for Delaware and Wilmington deducted from the trended cost value of each company a dollar amount representing supersession. This was done on the basis of the testimony of a witness called by the Commission. Supersession was defined by this witness as the effect of the development of new materials, designs and methods of construction which have superseded older materials or methods: He testified that supersession reduces the value of old property much as does the advent of a new model car reduce the value of the old. Accordingly, he testified that trended cost value must be discounted for supersession if it is to have any degree of reality as a measure of value.

The Superior Court rejected the deductions for supersession, in the case of Delaware, approximately $1,300,000 and, in the case of Wilmington, approximately $450,000, on the ground that there was no proof in the record upon which a dollar amount of supersession could be based and that the amounts deducted for supersession were nothing more than an opinion of the witness based upon unsubstantiated personal judgment.

We think the Superior Court was correct in so ruling. In the last analysis, the testimony upon which the deduction for supersession was purportedly based was the proposition that if these companies' properties were to be constructed today they would not be reproduced in the same form and with the same materials. This may be so, but the fact remains that these properties today serve the purpose for which they were originally designed and are in fact adequate for the companies' business.

We think, as did the Superior Court, that in making a deduction for supersession the Commission failed to value the companies as they in fact existed. It committed the fundamental error

of penalizing the companies because their properties were in a form other than would be constructed today, and, in the face of the uncontradicted evidence, that they were adequate for the purpose of supplying water. Furthermore, the actual dollar deduction for supersession finds in the record no actual supporting proof whatsoever.

The Superior Court's rejection of a deduction for supersession is affirmed.

### 2. Accumulated Depreciation

The Commission deducted from the trended cost figures an item for depreciation amounting to 39.9% of the cost figures. This is the precise percentage of depreciation which had been deducted by the companies from their original cost base. It is argued by the Commission that this is the only logical manner of determining the percentage of depreciation of a trended value rate base.

The Superior Court rejected the argument as an arbitrary application of a theoretical formula derived from an average life span of different elements of the plants. Rather it was held that depreciation of a trended cost value should be based upon a careful consideration of the actual facts, i. e., the actual physical depreciation of the assets involved. This is what the companies purported to do. .

We agree with the Superior Court. It is, we think, obvious that the companies in depreciating the original cost of their properties on their books were not attempting to determine a fair rate base. Since the depreciation reserve carried on the companies' books does not have any exact relationship to accumulated depreciation for rate base purposes it was arbitrary for the Commission to accept a ratio established by accumulated depreciation reserve and to ignore entirely the companies' studies of actual accumulated depreciation. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Super. 341, 144 A.2d 648. The fundamental error of the Commission in this respect was its failure to give any weight at all to trended cost depreciated. *Diamond State Telephone Co.,* 10 Terry 203, 113 A.2d 437.

### 3. *Cash Working Capital*

The Superior Court reversed in part the allowance by the Commission of cash working capital for the companies. In this appeal the companies now accept the allowance in this respect made by the Commission. The point is therefore not before us and the Superior Court's reversal of part of the allowance for cash working capital will be reversed and the Commission affirmed in this respect.

### 4. *Rate of Return*

The Commission argues the Superior Court committed error in reversing the Commission's ruling fixing the rate of return for Wilmington at 5.72% and for Delaware at 5.3%. Prior to the hearing before the Commission, it and the companies entered into a stipulation under which they agreed that the rate of return would not be more than 6%, and that no evidence of a fair rate of return need be offered in the proceedings.

The Commission determined the fair rates of return it allowed by determining the amount of income each company would be permitted to earn and then applied it to the rate bases previously determined by the Commission, thus arriving at the rates of return to be allowed. The Superior Court reversed the findings as to rates of return and remanded the matter to the Commission for further determination after hearing and the taking of evidence on the cost of capital to Delaware and Wilmington with proper consideration being given to debt capital and equity capital, and with proper consideration being given to necessary adjustments to be made to bring the capital structure used for rate purposes into accord with one that is fair and reasonable.

We agree with the Superior Court that there is in the record no evidence upon which to base a finding of rates of return. If it becomes important to make such a finding, then we think evidence upon which to base it must be offered for the consideration of the Commission. Certainly, a mathematical computation based upon a fair rate base and

allowable future earnings, both of which were successfully attacked by the companies as unfair, does not establish the ultimate fact of what are fair rates of return. We think, in fact, that the Commission's computations established no ultimate fact and that the Superior Court was·correct in remanding the issue for further proceedings.

Furthermore, we point out that in the ordinary application for an increase of rates three major ultimate facts must be established by the Commission. These are the fair value rate base, the amount of dollars required by the utility to operate, and the fair rate of return the utility may be permitted to earn on the fair value of its properties. If these facts are established a considered judgment may be made by the Commission. Thus, the rate of return applied to the rate base can be used as a test of the reasonableness of the utility's requirement of income. Similarlly, the fairness of the rate base, or the fairness of the rate of return can be tested by the actual cash requirements of the utility.

All three ultimate facts are interdependent and the final result must reconcile all three. We think it apparent that if this balance cannot be achieved, then a mistake has been made in determining one or more of the three basic facts.

### 5.   Operating Expenses

The Commission argues that the Superior Court committed error in reversing the Commission's determination of operating and payroll expenses of the companies.

In determining operating expenses to be allowed a utility, the Commission is required to allow legitimate expenses incurred by the utility during the test period, in this case the year 1961. *Diamond State Telephone Co.*, 1 Storey 525, 149 A.2d 324. The allowance of such expenses does not call for the exercise of judgment by the Commission. Such legitimate expenses are allowed as a matter of course.

The Commission disallowed as operating expense the sum of $20,000.00 for Wilmington. This disallowance was reversed by the Superior Court holding that since the amount appeared on the books of the company for the year 1961 it was a legitimate operating expense.

The matter came about in this way. Delaware and Wilmington, along with other water companies controlled by their parent company, operate under a Division Office of the parent. Prior to 1960 all overhead charges incurred by the Division Office were allocated among all the operating companies on a percentage basis. In 1960, however, the system was changed to apportion such charges among the operating companies on a time sheet basis. The result was to greatly increase the charge to Wilmington.

The disallowance of the $20,000 was made primarily on the basis that it was too large an increase when compared to prior years. However, we think a mere increase in expenditure does not, of itself, require adjustment, provided it has not come about by waste or inefficiency. Since the Commission offered no proof that the expense was not actually legitimately incurred, and since it actually occurred during the test period, we think it was arbitrary to exclude it.

The restoration by the Superior Court of $20,000.00 to the operating expenses of Wilmington is accordingly affirmed.

The Commission argues that the Superior Court's reversal of the denial of increased payroll taxes, insurance costs, welfare expenses, and so forth, required for the future by increased payroll expenses was error.

These increases did not occur in the test period of 1961 but became effective on January 1, 1962. The companies' evidence was that the increases in payroll expense, which went into effect in 1962, had been distributed to the accounts of both companies in proportion to actual experience in the test year. It seems clear from the record that payroll expenses of both Wilmington and Delaware will not remain static for the future, and it is also clear that such expenses will increase

to some extent for the future. The companies justify their request upon the fact that their payrolls were increased in 1962 by 8.7%. This fact seems to be established in the record.

It is, of course, true that the increase in payroll expenses was not incurred in 1961, the test period, but the companies became obligated for them in that year. Under the circumstances, therefore, we think it was proper for the Superior Court to have reversed the denial by the Commission of such increases. *Diamond State Telephone Co.,* 9 Terry 317, 103 A.2d 304; *City of Philadelphia v. P. U. C.,* 173 Pa. Super. 38, 95 A.2d 244. The ruling of the Superior Court upon the question is affirmed.

### 6.  *Computation of Average Indebtedness of Wilmington*

The Commission argues that the Superior Court committed error in reversing the Commission's computation of Wilmington's income taxes for the test year. The point involved is the amount of interest paid for 1961. The reversal was ordered ·for the stated reason that the record contained no facts upon which a computation of interest actually paid during 1961 could be made. The Commission argues that there is in the record a basis for the computation of Wilmington's average indebtedness for 1961, but since we are not so clear that this is so, and since the case must go back to the Commission for further consideration in any event, we affirm the remand upon this point.

The judgment below is affirmed with the exception of the remand to the Commission for further consideration of the allowance of cash working capital which is reversed.