**PUBLIC SERVICE COMMISSION OF the STATE OF DELAWARE, Defendant-Appellant,**

v.

**WILMINGTON SUBURBAN WATER CORPORATION, Plaintiff-Appellee.**

Supreme Court of Delaware.

Submitted June 13, 1983.

Decided Sept. 26, 1983.

George C. Hering, III, and Clarkson P. Collins, Jr., (argued), Morris, James, Hitchens & Williams, Wilmington, for defendant-appellant.

H. James Conaway, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, and William J. Lebuhn (argued), General Waterworks Management & Service Co. (Corporate Counsel), Bryn Mawr, Pa., for plaintiff-appellee.

Before McNEILLY and MOORE, JJ., BROWN, Chancellor.

MOORE, Justice:

This appeal by the Public Service Commission (the Commission) presents an issue of first impression: whether the Commission's assignment of a zero cost of capital to property contributed to a utility, thereby reducing the return allowed that utility on its rate base, circumvents the Public Utilities Act of 1974 [26 *Del.C.* § 101 et seq. (Supp.1982) (the Act) ].[1] Wilmington Suburban Water Corporation (WSWC), a regulated public utility, was denied a proposed water rate increase by the Commission because of the questioned zero cost assignment. Upon WSWC's successful appeal to the Superior Court, the Commission's order was reversed and the matter was remanded for a proper recalculation of the increase. We conclude that under the Act the Commission's order was improper since the purpose of its action was to achieve indirectly that which the law prohibits it from doing directly. Hence, we affirm the Superior Court and remand for a recalculation of the water rate increase in accordance with Delaware law.

### I.

The appellee, WSWC, is a regulated public utility within the meaning of section 102(2) of the Act. 26 *Del.C.* § 102(2) (Supp. 1982). WSWC provides residential, commercial, and industrial water services for a large portion of New Castle County, Delaware. WSWC is itself a wholly-owned subsidiary of General Waterworks Corporation, a holding company controlling over sixty public water suppliers throughout the United States.

The Commission is a statutorily-created administrative body charged with exclusive original supervision and regulation of all public utilities. See 26 *Del.C.* § 201 (Supp. 1982). Under the Act, the Commission is authorized to investigate any public utility, to set standards and practices for public utility operations, and to fix just and reasonable rates to be charged or applied by a utility for a particular service. 26 *Del.C.* §§ 206, 207, 209 and 311 (Supp.1982). Other powers and duties of the Commission are set forth in the Act and in the rules and regulations promulgated by the Commission pursuant to the Act.

Because this dispute centers on the Commission's ascertainment of a just and reasonable rate to be charged by WSWC and in particular, on the calculation of WSWC's rate base, it is necessary to define and describe the method for determining a just and reasonable rate.

In Delaware, the primary objective of rate-making by the Commission is to fix rates sufficient to yield a fair return to the utility upon the present value of the property dedicated to public use. *Application of Wilmington Suburban Water Corp.,* Del.Supr., 211 A.2d 602, 605 (1965) (applying the prior Public Utility Act). *See Application of Delmarva Power & Light Co.,* Del.Super., 337 A.2d 517, 518 (1975). A fair return to the utility is an amount sufficient to pay operating expenses, to attract new investors, and to pay a fair return to the utility's existing investors. *Application of Wilmington Suburban Water Corp.,* Del. Supr., 211 A.2d at 605. The dollar figure representing a fair return to the utility is the product of the rate base of the utility

---

1. Contributed property includes customer advances and contributions in aid of construction. Contributed property is property such as water pipes, power lines, or other utility improvements made by a developer or other industrial concern which are donated, contributed, or transferred to the utility. The utility then assumes the responsibility of operating and maintaining this property.

applied to the utility's rate of return, plus the utility's operating expenses.[2]

The rate base is a statutory term defined in Section 102(3) as follows:

(3) "Rate base" means:

a. The original cost of all used and useful utility plant and intangible assets either to the first person who committed said plant or assets to public use or, at the option of the Commission, the first recorded book cost of said plant or assets; less;

b. Related accumulated depreciation and amortization; *less;*

c. *The actual amount received and unrefunded as customer advances or contributions in aid of construction* of utility plant, and less;

d. Any accumulated deferred and unamortized income taxes and investment credits related to plant included in paragraph a. above, *plus;*

e. *Accumulated depreciation of customer advances and contributions in and of construction* related to plant included in paragraph a. above and plus;

f. Materials and supplies necessary to the conduct of the business and investor supplied cash working capital, and plus;

g. Any other element of property which, in the judgment of the Commission, is necessary to the effective operation of utility.

26 *Del.C.* § 102(3) (Supp.1982) (emphasis added). Simply defined, the rate base is the dollar value of the utility's plant employed in providing its service to the public and upon which the utility and its investors are entitled to earn a fair return. The rate base is, in effect, the investment upon which the investors' return is earned.

The rate of return is a percentage figure set by the Commission. This percentage is multiplied against the rate base in order to determine a fair return to the utility. No method for calculating the rate of return is mandated by the Act. In practice, the Commission employs the weighted average cost of capital approach in determining the rate of return. This entails an examination of the capital components actually employed to finance the utility's plant, i.e., the presence of debt, preferred stock, common equity capital, etc., is ascertained. Next, the percentage of the rate base funded by each of these capital components is calculated. Third, the annual cost of each capital component is calculated. The percentage of rate base funded by each component is then multiplied by the annual cost of the particular component, yielding the weighted average cost rate of each component. This weighted average cost rate is expressed as a percentage. The sum of these rates is the rate of return, which is then multiplied by the rate base to yield the utility's fair return. From the foregoing discussion, it is clear that the larger the rate base, the greater the fair return to the utility, assuming the rate of return remains constant. It is also clear that assuming the rate base remains constant, reducing the rate of return will reduce the fair return to the utility.

In this action, both the Commission and WSWC accept the weighted average cost method for determining a fair return. Their dispute centers on the calculation of WSWC's rate base and in particular, whether the depreciation on property supplied to WSWC by noninvestors, i.e., contributed property, must be assigned a zero cost of capital or some positive cost of capital un-

**2.** The Commission asserts that rate determinations involve four basic inquiries, expressed concisely in the formula $R = E + (Vxr)$. Defining the four variables,

R equals the utility's gross revenues under the rate structure examined.

E equals the operating expenses including maintenance, depreciation, and all taxes incurred to produce R.

V equals the value of the utility's property which provides the service for which rates are charged, i.e., the rate base.

r equals the rate of return, expressed as a percentage, which should be applied to the rate base to establish the return to which the investors in the utility enterprise are reasonably entitled.

Commission's Opening Brief at 6 [citing 1 A. Priest, Public Utility Regulation, 45 (1969)].

der the weighted average cost of capital approach. It is plain from Section 102(3) that in determining the rate base, the accumulated depreciation on contributed property must be added back while the value of such contributed property is deducted. *See* 26 *Del.C.* § 102(3) (Supp.1982). However, this Court has not previously considered whether the depreciation on contributed property must be given a positive cost and hence, factored into the fair return, or whether the property can be assigned a zero cost and in effect, cancel out the add back of such depreciation.

The Commission pointedly observes that contributed property is supplied to WSWC by noninvestors, and that depreciation on investor-supplied capital is included in the rate base for purposes of computing a fair rate of return to the utility. The Commission says that to permit WSWC to earn a return on noninvestor-supplied capital is inequitable to the utility's customers and correlatively, operates as a windfall to utility investors. The Commission bases this argument on the notion that the utility incurred no costs in acquiring property contributed or donated to it, and therefore, WSWC cannot in fairness be reimbursed for the value of such property by rate payments from customers. Correlatively, the Commission argues that investors in WSWC ought not receive a return on property which was financed by customers rather than investors. The Commission further contends that because noninvestor-supplied capital, in the form of depreciation on contributed property, is included in the rate base, it is justified in treating such depreciation as a zero cost item in calculating the rate of return.

WSWC asserts that the Commission is attempting to do indirectly that which the Act prevents it from doing directly. In particular, WSWC argues that the Commission effectively removed the accumulated depreciation on contributed property from the rate base by assigning it a zero cost. WSWC also notes that depreciation was included in the capital structure of the utili-

ty. WSWC reasons that because the Commission assigned a zero cost to depreciation, the weighted average cost is zero. Thus, depreciation is neither factored into the rate of return nor the utility's fair return.

## II.

This Court's standard of review is set forth in Section 510 of the Act. 26 *Del.C.* § 510 (Supp.1982). *See Matter of Slaughter Beach Water Co.,* Del.Supr., 427 A.2d 893, 895 (1981). The appeal is considered upon the record before the Commission, [26 *Del.C.* § 510(b) (Supp.1982)], and under subsection 510(c), the Commission's findings shall be upheld if they are supported by sufficient evidence, free of error of law, and not arbitrary or capricious. *Id.*

From the foregoing definition and description of the rate determination method, it is clear that the Act does not specifically detail a formula for calculating utility rates. Notwithstanding this, it is settled that the Commission is required to adhere to all rate-making guidelines within the Act. *See Application of Wilmington Suburban Water Corp.,* Del.Supr., 211 A.2d 602, 605 (1965); *Application of Diamond State Telephone Co.,* Del.Supr., 113 A.2d 437 (1955), modifying on reargument, 107 A.2d 786 (1954); *Application of Delmarva Power & Light Co.,* Del.Super., 337 A.2d 517, 518–19 (1975).

In *Application of Delmarva Power & Light Co.,* arising under the prior act, a utility challenged the Commission's approval of only one-third of a proposed rate increase and correlative denial of the remaining two-thirds, asserting that the Commission should have considered earnings data for the two years after the test year period, rather than merely the test year data. *Application of Delmarva Power & Light Co.,* Del.Super., 337 A.2d at 518. The Superior Court concluded that the statutory duty of the Commission to fix just and reasonable rates outweighed the statutory policy of prompt decisions in rate proceedings. Hence, the Superior Court remanded for a consideration of the earnings data for the

two years after the test year in meeting the guideline of a just and reasonable rate. *Id.* at 519. Similarly, in *Application of Wilmington Suburban Water Corp.*, this Court applied statutory guidelines in the prior utility act in rejecting a Commission deduction for supersession from the trended cost value of the utility. *Application of Wilmington Suburban Water Corp.*, Del.Supr., 211 A.2d at 605.

■ Here, the principal applicable statutory guideline is Section 311 of the Act, which states in pertinent part:

In determining the just and reasonable rate to be charged, the Commission shall consider the revenue needs of the utility, its past and projected rates of return on its rate base, or when appropriate, its operating ratio.

26 *Del.C.* § 311 (Supp.1982). Section 102(3) defines the term "rate base". *See* 26 *Del.C.* § 102(3) (Supp.1982). As defined, rate base includes accumulated depreciation on contributed property; such depreciation must be added back to compute the rate base. *Id.*[3] Adding back the depreciation on contributed property necessarily enlarges the rate base and thereby, increases the utility's fair return. While the Commission has complied with the mandate of Sections 102(3) and 311 by adding back the depreciation, it has artfully executed a flank attack

on the other variable employed in figuring a fair return, the rate of return, in an attempt to reduce the fair return to WSWC. In particular, the Commission identified contributed property as a separate component under the weighted average cost of capital method. The Commission then assigned a zero cost to this component, necessitating a zero average weighted cost. The result is a reduction in the aggregate of weighted average costs for each component in the rate of return. By shrinking the rate of return, the Commission reduced the product of the rate base and the rate of return, i.e., the Commission has reduced the fair return to WSWC. This indirectly achieved that which sections 311 and 102(3) directly prohibit. *See Diamond State Telephone Co. v. Public Service Commission*, Del.Supr., 367 A.2d 644, 647 (1976).

■ In its defense, the Commission argues that the Superior Court intruded upon the former's specialized competence to determine a rate of return, thereby exceeding the permissible scope of review. In light of the standard of review set forth in Section 510(c), this argument is unacceptable on its face. The Superior Court restricted itself to reviewing only the formulae used by the Commission staff. Moreover, if the Superior Court was precluded from reviewing the

---

**3.** Artesian Water Company, another public utility, was permitted to intervene and file a brief as amicus curiae in support of WSWC's position. Its brief argues that the add back of depreciation on contributed property is a simple bookkeeping entry designed to ensure that depreciation is not deducted twice from the rate base. Answering Brief of Artesian Water Company as Amicus Curiae at 19, No. 29, 1983 (Del.Supr., filed April 14, 1983). Artesian contends that subsection 102(3)(b) includes depreciation on contributed property, as well as investor-funded property. *See* 26 *Del.C.* § 102(3)(b) (Supp.1982). Artesian then reasons that subsection 102(3)(e), the add back provision, is meant to guarantee that the rate base will consist only of investor-funded plant. Answering Brief of Artesian Water Company as Amicus Curiae at 18–20, No. 29, 1983 (Del. Supr., filed April 14, 1983). From here, Artesian argues that because the rate base consists only of investor-funded plant, it is improper to

treat any part of the rate base as zero cost capital in computing the utility's fair rate of return.

Artesian's argument rests on the premise that subsection 102(3)(a), requiring the addition of the original cost of all used and useful plant to the rate base, includes contributed property as well. If this were true, then subsection 102(3)(b)'s language, "related depreciation", would encompass depreciation of contributed property. Buttressing Artesian's initial premise is subsection 102(3)(c), which requires the subtraction of contributed property. If 102(3)(a) did not include contributed property, 102(3)(c) would be mere surplusage.

Because we view the Commission's arguments concerning the presence of noninvestor supplied capital as a quarrel with the statute to be more appropriately resolved by legislative action, we decline to address Artesian's arguments as to the add back of depreciation.

Commission's formulae, then the Commission would be given a carte blanche to circumvent the Act by a total preclusion of judicial review of its actions. Accepting the Commission's argument would allow it to do exactly what occurred here in violation of Delaware law. The Commission makes much of the fact that part of the rate base includes depreciation on contributed property, which was not financed by the utility's investors. From this the Commission argues that customers in effect are penalized by higher rates, due to donations of property, while investors obtain the windfall of a return on property which they did not finance. But the Commission does not attempt to justify its flank attack on the rate of return variable. Rather, it merely asserts the inequity of the statute, the purpose behind the rate base provision therein, and the claimed discretion of the Commission to work around the statute.

The Commission's argument ignores the well-established principle that if an otherwise valid statute causes or leads to an inequitable result, then it is the sole province of the legislature to correct it. *See Justice v. Gatchell,* Del.Supr., 325 A.2d 97 (1974); *Kent General Hospital v. Blanco,* Del.Supr., 195 A.2d 553 (1963). Neither the Commission nor this Court sit as a superlegislature to eviscerate proper legislative enactments. If the policy or wisdom of a particular law is questioned as unreasonable or unjust, then only the elected representatives of the people may amend or repeal it. Judges must take the law as they find it, and their personal predilections as to what the law should be have no place in efforts to override the properly stated legislative will. As Justice Holmes once commented:

" . . . while at times judges need for their work the training of economists or statesmen, and must act in view of their foresight of consequences, yet when their task is to interpret and apply the words of a statute, their function is merely academic to begin with—to read English intelligently—and a consideration of consequences comes into play, if at all, only when the meaning of the words used is open to reasonable doubt."

*Northern Securities Co. v. United States,* 193 U.S. 197, 401, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904).

We therefore conclude that sections 311 and 102(3) of the Act prohibit the Commission from assigning a zero cost of capital to the accumulated depreciation of property contributed or donated to a utility. Hence, the decision of the Superior Court is affirmed, and the case is remanded to the Commission for a recalculation of the water rate increase in accord with this opinion.

\* \* \*

AFFIRMED AND REMANDED.