**In the Matter of the Application of DELMARVA POWER & LIGHT COMPANY for an Increase in Electric Fuel Clause Adjustment Rates for Calendar Year 1982, Filed October 30, 1981—PSC Docket No. 81-39.**

Superior Court of Delaware,
New Castle County.

Submitted: Aug. 22, 1984.
Decided: Dec. 13, 1984.

Richard E. Poole, and W. Harding Drane, Jr., of Potter, Anderson & Corroon, Wilmington, and Dale G. Stoodley, General Counsel for Delmarva Power & Light Company, Wilmington, for appellant Delmarva Power & Light Co.

James McC. Geddes, and Shauneen Cruise Hutchinson, of Ashby, McKelvie & Geddes, Wilmington, for appellee Delaware Public Service Com'n.

WALSH, Vice Chancellor.[*]

This is an appeal from a decision of the Delaware Public Service Commission (the "Commission") which disallowed recovery of certain coal procurement costs which were sought by Delmarva Power & Light Company ("Delmarva") through its fuel adjustment clause. Delmarva contends the Commission's decision is against the weight of the evidence presented and contains er-

roneous conclusions of law. The Commission defends its ruling as a proper exercise of its administrative judgment.

## I

The fuel adjustment charge is a permanent feature of Delmarva's tariff. Its purpose is to permit the utility to recover concurrently, *i.e.*, monthly, the cost of fuel used in the generation of electricity. The calculation underlying the fuel recovery clause is approved by the Commission at the beginning of each year based on the utility's estimated fuel costs statement filed with the Commission in October of the preceding year. The present proceeding began with Delmarva's request for Commission approval of its fuel cost estimate for 1982. Upon the filing of that petition, the Office of the Public Advocate (the "OPA") moved to intervene in the proceeding alleging that Delmarva had incurred excessive, and unwarranted, costs relating to coal purchases at its Indian River power plant in 1981. To the extent that those allegedly inflated costs formed the projected fuel costs to be charged customers under the fuel adjustment clause to be effective in 1982, the OPA requested the Commission to disallow such expenses.

The Commission determined that under the provisions of 26 *Del.C.* § 303(b)[1] Delmarva should be required to demonstrate the need for the fuel adjustment request and the matter was referred to a Hearing Examiner under the provisions of 26 *Del.C.* § 502, for the purpose of receiving evidence and making recommendations to the Commission. The Hearing Examiner received documentary evidence and testimo-

---

[*] Assigned Pursuant to *Del.Const.* Art. IV § 13(2).

**1.** 26 *Del.C.* § 303(b) provides:

 (b) The Public Service Commission shall require all utilities operating within its jurisdiction to produce evidence at a public hearing of the need for a change in the fuel adjustment as a part of the rate-making procedure. Notice of such hearing shall be advertised in at least 1 newspaper in each of the 3 counties. As in other applications before the Public

Service Commission, the burden of proof that the fuel adjustment change is required shall be upon the utility. No change in the fuel adjustment shall be authorized by the Commission except by affirmative vote of the majority of all members appointed to the said Commission. The Commission shall consider the evidence for and against the proposed change as it would all evidence in any other rate-making procedure.

ny, much of it technical, over a period of eleven days. Both Delmarva and the OPA presented experts who evaluated the coal purchase practices of Delmarva and the impact of those practices on the cost of fuel used at the Indian River facility. Rate counsel employed by the Commission participated in those hearings, generally allied with the OPA. In a written report to the Commission, the Examiner discussed at length the evidence bearing upon Delmarva's coal acquisition policies and concluded that certain of its procurement contracts and practices were imprudent. The Examiner recommended the disallowance of approximately $4.7 million in coal costs. Delmarva filed extensive exceptions to the Examiner's report. The Commission's rate counsel excepted in certain limited respects.

After briefing and argument before it, the Commission accepted the Examiner's general conclusion of improvident coal purchases but disagreed with certain particulars of disallowance. The result of the Commission's decision, as implemented in its order of March 1, 1983, was to disallow approximately $3.1 million of coal acquisition expenses. This total was later reduced to $2.26 million as the result of certain adjustments made in one of the coal contracts during 1982. This appeal followed.

## II

At the outset it is necessary to resolve conflicting contentions concerning the appropriate test for judicial review of Commission decisions. By its express language 26 *Del.C.* § 510(c) requires the Commission's findings to be sustained if supported by "sufficient evidence, free of error of law and not arbitrary or capricious." Although this language appeared for the first time in the Public Utilities Act of 1974 (59 *Del.C.* Ch. 397), the concept was not new. Under the prior Act, the Commission was enjoined to set forth its findings in sufficient detail to permit the reviewing court to determine whether "proper weight was given to the evidence." 26 *Del.C.* § 183(b) (now

§ 503(b)). This provision had been interpreted to require a judicial review test of whether the Commission's findings were against the weight of the evidence and "not whether there was substantial evidence" to support them. *Application of Diamond State Telephone Co.*, Del.Supr., 113 A.2d 437, 440 (1955); *Application of Wilmington Suburban Water Corp.*, Del.Supr., 211 A.2d 602 (1965). Delmarva relies upon this decisional authority for its contention that the Commission's findings in the case must meet what it views as the higher test of "sufficient" evidence and not the "substantial" standard usually applied to findings of administrative agencies.

The Commission argues to the contrary that with the passage of the 1974 Act, and specifically § 510(c) in its present form, and in subsequent decisions applying that section, a subtle but distinct change has occurred in the standard of appellate review. The Commission claims that the Delaware Supreme Court in *Matter of Slaughter Beach Water Co.*, Del.Supr., 427 A.2d 893 (1981) appeared to apply a substantial evidence test interchangeably under Section 510(c), while the Superior Court in a 1976 appeal from the Commission characterized the standard as one of "sufficient substantial evidence." *Diamond State Telephone Co. v. Public Service Commission*, Del.Super., 357 A.2d 741, 744 (1976), *revd. on other grounds*, Del.Supr., 367 A.2d 644 (1976).

▮ Both parties seem to have overlooked the effect of the Administrative Procedures Act (29 *Del.C.* 101) and its stated purpose of standardizing the hearing procedures of designated state agencies and to "specify the manner * * * [of] judicial review." 29 *Del.C.* § 10101. The Public Service Commission is specifically designated as an agency subject to the application of the Administrative Procedures Act. 29 *Del.C.* § 10161. To the extent that any previously-applied administrative standard, whether or not legislatively based, is at variance with the provisions of the Act, the latter governs through the principle of im-

plicit legislative repeal. *State, Dept. of Labor v. Minner,* Del.Supr., 448 A.2d 227 (1982); *Olney v. Cooch,* Del.Supr., 425 A.2d 610 (1981).

The standard embraced within the Act is clearly one of substantial evidence. 29 *Del.C.* § 10142(d) defines the standard for review of "case decisions" in the following language:

(d) The Court, when factual determinations are at issue, shall take due account of the experience and specialized competence of the agency and of the purposes of the basic law under which the agency has acted. The Court's review, in the absence of actual fraud, shall be limited to a determination of whether the agency's decision was supported by substantial evidence on the record before the agency.

Whatever may have been the effect of the adoption of Section 510(c) as part of the revision of the Public Service Commission Act in 1974, the passage of the Administrative Procedures Act two years later constitutes a clear legislative statement that previous nonuniform norms must yield to standardization. *State, Dept. of Labor v. Minner, supra.*

■ The standard of judicial review from Commission case decisions then is one of substantial evidence which is defined as: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). It is more than a scintilla but less than a preponderance, the usual standard of proof in a civil proceeding. *Olney v. Cooch, supra.* Moreover, in view of the admonition of § 10142(b) that the Court in reviewing factual determinations recognize "the experience and specialized competence of the agency" the Court is not permitted to substitute its judgment for that of the agency or to adopt an independent view of the record.

III

Before turning to the Commission's substantive rulings of disallowance a procedural issue must be addressed. Delmarva complains that the Commission placed upon it an unwarranted burden of proving justification for expenses actually incurred in the ordinary operation of its business. Additionally, Delmarva complains that the Commission used hindsight judgment as a standard for determining the prudence of such expenditures.

■ In unequivocal language Section 303(b) places upon a utility seeking relief under the fuel adjustment feature in its tariff "the burden of proof" that the "change is required." Delmarva does not question the impact of the statute but argues that once it has satisfied its initial burden by demonstrating that claimed fuel costs were actually incurred in the base year, the responsibility is then upon the Commission, or the Public Advocate, to prove the expense was imprudently incurred. In the context of a rate case, the Commission is required to allow a utility normally accepted operating expenses in the absence of a finding of waste, inefficiency or bad faith. *Diamond State Telephone Co.,* Del.Super., 103 A.2d 304 (1954); *Application of Wilmington Suburban Water Corp.,* Del.Super., 203 A.2d 817, 836 (1964), *aff'd,* Del.Supr., 211 A.2d 602 (1965).

■ As the preamble to the original session law indicates, the enactment of Section 303(b) was a direct legislative response to the "pro forma approval" by the Commission of fuel adjustment clauses which resulted in large increases in utility rates. 60 *Del.Laws* Ch. 431. The preamble recognized that the cost of fuel has been the largest single factor in utility rate increases, and expressed the intention that fuel adjustment applications receive special scrutiny by the Commission. The scope of Section 303 has not been the subject of previous judicial interpretation but, given its background, its language strongly suggests a departure from the standard of normal acceptance applicable to ordinary

and less volatile operating expenses. Thus, it is not sufficient for the utility merely to demonstrate that the fuel expense was incurred but that it was justified under the circumstances. Just as Section 307 requires the utility to prove that its rates are "just and reasonable" as part of a general rate proceeding so must it prove that its fuel adjustment requests, and the cost experience which supports them, are both necessary and consistent with the interests of its ratepayers. Thus, to the extent the Commission required Delmarva to demonstrate not only the fact of expenditure but its prudence as well, it complied with the mandate of Section 303(b).

### IV

Delmarva and the Commission agree that "prudence" is an appropriate standard by which to judge the allowance of costs under a fuel adjustment clause. They differ as to its meaning. Delmarva maintains that in the area of utility regulation, conduct is deemed imprudent only if unreasonable under the circumstances and the utility is not required to foresee, that is, anticipate, remote consequences of its acts. The Commission urges a high standard: That if the utility could have foreseen the consequences, but did. not do so, its action, or nonaction, may be deemed imprudent.

■ Prudence is a difficult standard both to define and apply. In common parlance it is equated with reasonableness and caution, the civil standard by which ordinary negligence is tested. Its application to the conduct of a utility, however, usually takes place in the exercise by a utility of its contractual rights, *i.e.*, in the area of purchases or financing. Occasionally, even in the contractual area, there are risks encountered and a standard of reasonableness requires that they be anticipated. As the New York Public Service Commission noted: "Con Edison's conduct should be judged by asking whether it was reasonable at the time; under all the circumstances.... Those circumstances, of course, must take into account the risks ... and

the consequences of imprudence or mismanagement...." *In Re Consolidated Edison Co. of New York, Inc.*, 45 PUR 4th 325, 332 (1982). Such a standard measures the conduct under scrutiny by the circumstances then present and while review is always *post facto* the use of hindsight is not appropriate. A utility is not chargeable with knowledge of facts which were not known, or knowable, at the time it acted. Such a standard would not only be unfair but unworkable.

■ Although reasonableness is a good foundation on which to build a definition of prudence, the nature of a public utility requires that the two terms not be necessarily viewed as synonymous. By analogy to the law of trusts, prudence requires more than reasonableness. In *City of El Dorado v. Arkansas Public Service Commission*, Ark.Supr., 235 Ark. 812, 362 S.W.2d 680, 683 (1963), the Arkansas Supreme Court recognized such a parallel in the duty of a public utility stating, "It is the duty of the Company to operate in such manner as to give to the consumers the most favorable rate reasonably possible. This stems from the fact that the State has given the Company the exclusive right to sell and distribute gas to its customers. Consequently the Company bears a trust relationship to its customers and must conduct its operations on that basis...." This trust relationship is consistent with the requirement, supported by Delaware case law, that any proposed increase in rates be shown to be "in the public interest and not merely consistent therewith ...." *Diamond State Telephone Co. v. Public Serv. Com'n.*, Del.Supr., 367 A.2d 644, 648 (1976).

■ The law of trusts offers two additional traits of prudence which find application—skill and caution. At a minimum, fiduciaries are required to "exercise the judgment and care under the circumstances then prevailing which men of prudence, discretion and intelligence exercise in the management of their own affairs." 12 *Del.C.* § 3302; *In Re Cook's Trust Estate,*

Del.Ch., 171 A. 730 (1934); *Wilmington Trust Company v. Coulter,* Del.Supr., 200 A.2d 441 (1964). A trustee who holds himself out as having greater skill than that of a person of ordinary prudence will be judged in light of that superior skill. *In Re Killey's Estate,* Pa.Supr., 457 Pa. 474, 326 A.2d 372, 375 (1974); Restatement (Second) of Trusts § 174 (1959). The element of caution is also coupled with the trustee's duty of reasonable care. *Union Nat. Bank of Wilmington v. Wilson,* Del.Ch., 25 A.2d 450, 454 (1942); *In Re Cook's Trust Estate, supra; Wilmington Trust Company v. Coulter, supra.*

The basic standard which evolves then is one of reasonable care under the circumstances but, because of the special trust-like relationship which a public utility bears to its customers, the utility is required to exercise skill and caution in the expenditure of funds so as to minimize the risk that its ratepayers will suffer through mismanagement. Whether this obligation when exercised in the area of fuel purchases be viewed as "special," a designation which Delmarva disputes, is not important. Because the fuel adjustment clause provides the utility with a quick and relatively inexpensive alternative to rate increase proceedings and in view of the size of the expenditures sought to be passed on to ratepayers,[2] the utility is required to exercise a degree of skill and caution commensurate with the magnitude of the risk. This standard requires that the utility know what skillful persons knowledgeable in the area of fuel purchases should know and that it act to recognize and guard against potential problems. It is not chargeable with predicting future events but it is charged with foreseeing those problems which skillful persons might reasonably anticipate and, in the exercise of caution, protect against their consequences.

## V

In the early 1970's Delmarva determined to increase its electrical generating capacity by adding a new unit at its Indian River facility near Millsboro, Delaware. Like many utilities, Delmarva was re-examining the use of oil because of its rapidly increasing cost and unstable world sources. In fixing upon coal as the designated fuel, Delmarva was required to meet recently adopted environmental standards regarding air pollution. In order to avoid the cost of installing costly air scrubbers necessary for burning high sulfur coal, Delmarva decided by 1975 to limit its coal purchases to low sulphur or "compliance coal." Although the use of compliance coal eliminated the need for expensive air pollution controls, securing an adequate supply of this type of coal promised to be expensive. As a result of the 1973–74 Arab oil embargo, the price of compliance coal had doubled in the course of four years and was much in demand by utilities and by the steel industry. Delmarva retained a consultant to study the feasibility of securing compliance coal purchases through long-term contracts as opposed to reliance upon spot purchases in a fluctuating market. Acting in part upon the recommendations of its coal purchase consultant, Delmarva determined in 1977 to secure the bulk of its coal, approximately two-thirds of the 900,000 tons needed annually at the Indian River plant, through five year contracts with two principal suppliers: Continental Coal Company ("Continental") of Huntington, West Virginia and Avery Coal Company ("Avery") of Philipsburg, Pennsylvania. Both the Hearing Examiner and the Commission were critical of certain provisions contained in each of these contracts as well as Delmarva's acceptance of performance by both suppliers. In these respects the Commission deemed Delmarva to have engaged in imprudent purchases which resulted in unnecessary fuel costs sought to be passed along to

**2.** Fuel costs sought to be collected by Delmarva under the 1982 filing were estimated by the utility at more than $136 million.

Delmarva's customers through the fuel adjustment clause.

Delmarva's decision to purchase compliance coal through two primary suppliers followed the advice of a retained outside consultant, the John T. Boyd Company. Because Delmarva lacked "in house" expertise in the area of coal purchases, it eventually hired one of its consultant's employees to manage its coal procurement. This individual, however, had limited experience in the purchase of compliance coal. In negotiating the Continental contract, Delmarva made two basic decisions both of which impacted significantly on coal expense in the first three years of the contract. First, it decided to use a price escalation based on general consumer price indices rather than coal production costs, as it did in the Avery contract. Second, it failed to put a cap or ceiling on the escalator clause. The combined result of these policies was to require Delmarva to pay unusual increases for Continental coal during a time of rapid general inflation in 1979 and 1980 while coal production costs increased moderately because of slack demand for compliance coal.

While the price escalators which Delmarva negotiated for the Avery contract prevented rapid unit increases, Avery proved an undependable supplier. Because its coal failed to meet specifications, Delmarva terminated Avery's contract in late 1979. Eventually, Delmarva entered into another contract with Avery almost a year later upon terms which the Commission believed did not reflect Delmarva's superior bargaining position. The Commission's disallowances under both contracts bear separate analysis.

## VI

■ The Commission determined that Delmarva was imprudent in the selection of a price formula for the Continental contract which obligated Delmarva to purchase 300,000 tons annually of compliance coal over a five year period. Through the use of an unprecedented escalator clause, the Commission charged, Delmarva obligated itself to pay for future coal deliveries at a rate in excess of that normally expected in the industry. The Commission thereupon disallowed $1,158,572 of actual expenditures during the years 1980 thru 1982. Delmarva claims the Commission's finding of imprudence was an exercise in hindsight judgment.

Delmarva concedes that an escalator based exclusively on the Consumer Price Index (CPI) and the Wholesale Price Index (WPI) had not previously been used in a fuel contract negotiated by a utility but it argues that if the compliance coal contracts with both Continental and Avery be viewed as an entity there is a "mixed" escalator. This is so, it contends, because the Avery contract contained the cost of production escalator which is standard in the industry and which the Commission viewed as having produced satisfactory results over the life of the Avery contract.

The use of an unprecedented pricing practice in and of itself should not be viewed as imprudent lest the utility be deterred from innovation. But the Commission's determination of imprudence in the use of this unprecedented escalator is justified. Because one of the principal, and most volatile, ingredients comprising the WPI and the CPI is the price of oil Delmarva factored into its coal contract, at a time of rising world oil prices, the very risk it sought to avoid through coal-fired generation. As the Commission noted, other items included in the CPI–WPI have no relation to the price of coal. Moreover, in view of the fact that fuel purchases constitute such a large portion of Delmarva's total operating expense, prudence would suggest that experimentation be restricted to other areas of expenditure. In short, Delmarva should not have experimented where the consequences of that failure would be so great. Nor is Delmarva to be excused because it achieved a mixed escalator in the combined contract. The use of the cost of production escalator in the Avery contract is a clear indication that Del-

marva was aware that such escalators were the norm. If the use of the WPI & CPI escalators was imprudent under the circumstances the fact that their adverse impact was not greater does not justify the experiment. Certainly the magnitude of Delmarva's purchase obligation under the Continental contract, 300,000 tons each year for 5 years, plus or minus 10% at buyer's option, speaks for itself.

The Commission also concluded that the Continental contract was deficient in its lack of a "market-cap," *i.e.*, the maximum price per ton Delmarva would be required to pay over the life of the contract. Delmarva contends that the CPI–WPI index is itself a cap but, in any event, to have insisted on a cap may have required making other contractual concessions to Continental. The testimony of Delmarva officials who were responsible for negotiating the terms of the Continental contract was not consistent or persuasive in explaining the absence of a cap. Standing alone the cap deficiency might be viewed as the result of negotiating judgment but when coupled with the use of an experimental escalator it is further evidence of imprudence. There is ample support for the Commission's finding that there was an absence of skillful negotiation caused in part by poor internal communication among those charged with securing coal procurement contracts.

The Commission arrived at its disallowance of Continental coal costs by comparison with the escalation rates reflected in various other coal contracts negotiated in 1977 and 1978. The Commission found that over the life of the Continental contract, Delmarva was required to incur an escalation charge of 9.5%. After reviewing various submissions by Delmarva, its staff and the Public Advocate the Commission adopted an escalation rate of 7.06% under comparable compliance coal contracts. The difference of 2.44% resulted in a $4.28 per ton disallowance and yielded a total of $1,158,572. The Commission subsequently refined these figures based on actual tonnage data submitted by Delmarva to yield a price disallowance of $4.89 per ton and a total disallowance of $1,926,240.

 Delmarva does not disagree with this methodology but objects to the refusal of the Commission to include among its comparison contracts certain coal contracts with high escalation rates. Delmarva's calculations included Kentucky underground/surface mines and West Virginia surface mines, which the Commission rejected for comparison purposes. Had these mines been included, the rate of escalation for sixteen coal contracts would have been 8.4%. Delmarva contends that a one percent difference would have rendered the overall effect so insignificant as to place the entire pricing concept in the realm of managerial judgment. Although the West Virginia Surface mines were also excluded, the main controversy between Delmarva and the Commission concerned the Kentucky mines. The Commission's stated reason for disallowing these coal contracts was that "the operation of state law and regulation has driven the cost of coal higher than experienced in other states with respect to surface mining." Although Delmarva claims there is no evidential basis for this finding, a clear inference to be drawn from the cross examination of its own expert witness, Mr. Stauffer, is to the effect that the Kentucky mines are acknowledged in the industry to have a higher cost pass-through. Indeed, the actual escalation rate attributable to these mines (9.4%) approaches the escalation rate on the Continental contract which used the WPI–CPI experimental standard. The Commission's disallowance of these contracts from its representative group finds evidential support and since its finding, to a certain degree, represents an application of its specialized competence it will not be disturbed.

## VII

In its review of the Avery contract the Commission was critical of Delmarva's acceptance of performance by that coal supplier and determined that the utility in-

curred unnecessary charges during the years 1980 thru 1982. It imposed a price disallowance of $5 per ton which ultimately resulted in approximately $1.2 million in disapproved fuel costs. The Commission found Delmarva to have acted imprudently in: (a) its failure to bargain aggressively in the renewal of Avery's contract, (b) its waiver of Avery's obligation to make up deliveries interrupted by a labor strike, and (c) its acceptance of coal with a low volatility factor. Each of these areas of disallowance bears discussion.

Delmarva's relationship with Avery was somewhat unusual. Avery had been selected originally as one of two principal suppliers for compliance coal in 1977. From the outset its coal failed to meet specifications, particularly in the area of ignition or volatility. This element is important because it affects the ease of combustion and consequent heat production. In November, 1979, Delmarva terminated its contract with Avery for cause and sought another supplier in its place. By this time the compliance coal market had changed because of slackened demand and had become a buyer's market. The state of the compliance coal market at that time suggested the advantage of spot buying of coal rather than long term contractual purchases. Even though Delmarva did not solicit a bid from Avery, the latter approached Delmarva in an effort to regain its position as a supplier of compliance coal. Since its mines were located nearer to the Indian River plant than any other supplier, Avery enjoyed a distinct shipping advantage and Delmarva was aware, based on audits conducted under Avery's 1977 contract, that the Delmarva contract was profitable to Avery. Moreover, Avery's public filings with the Securities and Exchange Commission portrayed the company as being in difficult financial straits. Delmarva eventually negotiated a three year contract with Avery at a price which the Commission determined was $3 more per ton than it should have paid in view of Avery's weak bargaining position.

Delmarva does not seriously dispute the Commission's recital of the circumstances in which Avery found itself in 1980. But it notes that Avery was the lowest responsible bidder in a competitive bidding process and Delmarva's representative in the Avery contract negotiations was an admittedly knowledgeable person, not the same individual responsible for the much-criticized Continental escalator. Delmarva disputes the Commission's finding of imprudence in negotiating the Avery price as pure hindsight in an area where a utility is permitted to exercise managerial judgment.

The Commission's criticism that Delmarva "did not bargain hard enough" in negotiating Avery's 1980 contract appears to have some evidential support. But a finding of need for improvement in managerial efficiency does not, *ipso facto*, translate into disallowance of increased expenses. *Park Towne v. Pennsylvania Public Utilities Commission*, Pa.Comm., 61 Pa.Cmwlth. 285, 433 A.2d 610 (1981). In reducing the allowable contract price from $39.25 per ton to $36.25, the Commission took a quantum leap from proper criticism to causation. The Commission assessment of a contract penalty necessarily assumes that with the benefit of more aggressive bargaining Delmarva would have achieved a lower price either from Avery or from another supplier. The evidence relied upon by the Commission to support this conclusion is extremely tenuous.

The mining and marketing of coal is calculated on the basis of geographical districts. Avery is located in District 1 which substantially comprises the Pennsylvania mines. The Commission acknowledged that there were no other suppliers of compliance coal in District 1 available to supply Delmarva in 1980. It determined, therefore, to use compliance coal price data for Districts 7 and 8 in central Appalachia. In addition, the District 7 and 8 prices used by the Commission were f.o.b., *i.e.*, minemouth prices while the Avery price was a delivered price. A further weakness in the Commission's analysis is that the sole

source for its District 7 and 8 prices was a publication entitled "Coal Week." While several witnesses referred to this publication, which apparently is a useful trade journal, its reliability is limited. Indeed, the publication carries a disclaimer that prices "are supplied without guarantee as to usefulness for a specific purpose."

■ The Commission did not determine that the Avery bid was too high, merely that it resulted from what the Commission perceived as the exercise of poor business judgment. In order for such a finding to result in a ruling of financial detriment, the Commission must establish that an alternative course of action, then available, would in all likelihood have yielded a different result. Speculation based on a reconstructed and hypothetical market will not suffice. Its use of *Coal Week* data because "no other measure is available" and its resort to coal prices in other districts which it justifies because of Avery's bad bargaining position is circular reasoning. Imprudent bargaining may result in cost disallowance only if it is shown to have caused additional expense. The utility's burden of proof does not require it to exclude the possibility that less expense would have resulted.

■ The second aspect of Commission disallowance under the Avery contract involved the question of low volatility, one of the deficiencies which prompted Delmarva to cancel Avery's 1977 contract. When it solicited bids from suppliers to replace Avery, Delmarva originally imposed a specification of 30% volatility but accepted coal under the second Avery contract with a 22% volatility rating. The Commission concluded that the lower volatility had a value of $2 per ton and disallowed approximately $400,000 of payments under the Avery contract.

Delmarva vigorously objects to the Commission's volatility disallowance as completely lacking in evidential support. It complains that the sole basis for the $2 per ton disallowance was the testimony of Dr. Sansom, the expert witness presented by the Public Advocate. It argues that the Commission accepted his testimony, which was highly conjectural, at face value while rejecting the utility's evidence to the contrary. It points out that while it originally sought a 30% volatility factor, it required Avery to institute a blending process to raise the level of volatility. It also presented evidence that its production department accepted the 22% volatility coal and found it satisfactory. Dr. Sansom's testimony was less than categorical. He testified that the heat rate performance at the Indian River plant had not been as high as other coal generating plants and that low ignitability *might* be a factor. Delmarva's expert questioned whether the volatility difference of the magnitude involved had any measurable effect. Moreover, the Hearing Examiner found Avery's volatility performance "satisfactory."

The Commission's finding that the volatility factor in the Avery coal was reflected in heat output at the Indian River plant rests upon an uncertain foundation. Delmarva's production personnel detected no such problem and Dr. Sansom's opinion is little more than conjectural. The real weakness in the Commission's disallowance ruling is its finding that in 1980, when the second Avery contract was negotiated, other suppliers could have supplied compliance coal at a higher volatility rate at a savings of $2 per ton. The evidence simply does not support that finding. Again, the Commission relied solely upon Dr. Sansom who based his $2 per ton recommendation on two bids submitted to Delmarva in January, 1980 in connection with its effort to find a successor to Avery. Because one bid was for $35 per ton with a 25% volatility factor and the other at $37.25 per ton with a 30% volatility factor, Sansom concluded that the 5% volatility difference supported a $2 per ton price difference. But, as Delmarva points out, there are other significant differences between the two bids compared to each other and to Avery. Neither bidder was capable of delivering the annual tonnage required by Delmarva. Moreover, the ash content was different

while one coal was fully washed and the other "dirty." Most important, the coal offered by the other two bidders was non-compliance coal (each had an .82% maximum sulfur content).

Despite the many variables which affected the comparable data the Commission accepted the recommendation of a $2 per ton disallowance. The determination was clearly arbitrary and lacking substantial evidential support. While there may be a market value for volatility the record before the Commission does not support its application to the second Avery contract.

The primary criticism which may be directed at the Commission's volatility disallowance is the same as that made concerning its "failure to bargain" determination. In its regulatory role the Commission is undoubtedly authorized to criticize utility practices which seem inefficient or improper and to require their correction. But to translate those criticisms into monetary disallowance requires the Commission to find, on the evidence before it, that such additional expense would have been avoided, under the circumstances then present, by following a more prudent course. To permit the Commission to disallow incurred expenses without that nexus would confer upon the Commission the power to impose monetary penalties under the guise of rate approval. The Commission's power to impose penalties is statutorily limited to compliance with the Public Service Commission Act or the Commission's own orders. 26 *Del.C.* §§ 217, 218.

The final disallowance ordered by the Commission in the Avery contract concerned the so-called strike waiver. The events which led to the waiver are not in dispute. Under its second contract with Delmarva, Avery was obligated to deliver a minimum number of tons monthly as well as annually. In the Spring of 1981, Avery was unable to meet its monthly delivery obligation because of labor disputes which effected the coal industry. Under a *force majeure* provision of the contract, the inability to make deliveries because of labor

strikes was excused but Avery, at the buyer's option, was required to make up the deficiencies at the rate of 7,000 tons a month when able to do so. By June of 1981, the strike was over and Delmarva had the option of ordering the shortfall to be remedied. Instead, Delmarva decided to rely upon purchases in the spot market which appeared to be lower than the Avery price. Delmarva advised Avery that it waived its right to the additional tonnage. Very shortly, however, the market changed and when Delmarva actually purchased the additional coal from Continental, and on the spot market, prices had escalated substantially. As a result, Delmarva paid $111,840 additional to that it would have been required to pay under the Avery contract.

Although Delmarva contends that it is only with the benefit of hindsight that the waiver proved costly, the Commission's finding of imprudence with regard to the strike tonnage waiver is clearly correct. At the time it exercised the strike waiver Delmarva had four years of experience in the purchase of compliance coal through contract and on the spot market. It knew, or should have known, that the spot market for coal was volatile and shallow, particularly after a 72 day nationwide miners' strike. While Delmarva had no way of knowing that spot prices would rise dramatically, there was no requirement that it waive its right to additional deliveries at the time it did. Avery's obligation to make up the strike tonnage was separate from the requirement to meet Delmarva's option to increase tonnage by 10% upon notice. It could simply have waited until its needs became clear and the market more predictable. In exercising the waiver it assumed an unnecessary risk and placed upon its ratepayers the cost of guessing wrong. Such conduct was clearly imprudent and the Commission finding to that effect must be sustained.

## VIII

Two final matters require comment. Delmarva notes that the basic fair-

ness of its coal contracts and its acceptance of performance under them have been established by the action of the Maryland Public Service Commission which rejected efforts to disallow fuel costs passed on to Maryland ratepayers who are also served by the Indian River Plant. The Maryland proceedings occurred after the Delaware Commission's ruling. While the two Commissions differ in certain respects, so too did the evidence presented to them. Consistency between regulatory agencies reviewing the same utility is clearly desirable but both the Commission and this Court are required to evaluate the evidence as presented in the light of controlling State standards.

 Delmarva also lodges a general complaint concerning the inclination of the Commission, in a contested proceeding before it, to adopt the position advanced by its own staff who appear as litigants before it and later as an advocate on appeal. It claims that this practice leads to the appearance of unfairness on the part of an administrative body with fact finding obligations. The Commission's unusual role as a "litigant, lawyer and judge" in rate fixing has previously been the subject of comment. *Application of Wilmington Suburban Water Corp.*, Del.Supr., 211 A.2d 602, 605 (1965). But, as the Court there noted, rate fixing is primarily a legislative function and the usual standards which insure fairness in judicial or quasi-judicial proceedings do not apply. Fairness is secured through the broad power of judicial review. *Id.* at 605. In this case the Commission and the Hearing Examiner conducted a thorough and detailed review of a complex matter. While the result does not escape modification, there is no basis to believe that the Commission did not perform its regulatory role in the public interest and with fairness to Delmarva.

### IX

In summary, the Commission's disallowance of costs associated with the Continental contract is supported by substantial evi-

dence and free of error of law. It is affirmed. The Commission's determination of imprudence with respect to the Avery contract is also affirmed on the strike tonnage waiver. The $2 per ton disallowance related to the low volatility factor and $3 per ton disallowance based on excess cost is not supported by substantial evidence and is reversed. The matter is remanded to the Commission for further proceedings consistent with this decision. Counsel should present an appropriate order.