**DELMARVA POWER & LIGHT COM-
PANY, Appellant-
Below-Appellant/Cross-Appellee,**

v.

**PUBLIC SERVICE COMMISSION of
the State of Delaware,
Appellee-Below-Appellee/Cross-Appellant.**

Supreme Court of Delaware.
Submitted: Sept. 24, 1985.
Decided: April 2, 1986.

Richard E. Poole (argued) and W. Harding Drane, Jr. of Potter Anderson & Corroon, Wilmington, Dale G. Stoodley, Gen. Counsel, Delmarva Power & Light Co., Wilmington, for appellant/cross-appellee.

James M. Geddes (argued) of Ashby, McKelvie & Geddes, Wilmington, for appellee/cross-appellant.

Before CHRISTIE, C.J., and HORSEY and MOORE, JJ.

HORSEY, Justice:

Delmarva Power & Light Company ("Delmarva") and Public Service Commission of Delaware ("Commission") each appeal from a decision of the Superior Court which affirmed in part and reversed in part a decision of the Commission. In 1983 the Commission had disallowed Delmarva's recovery in a 1982 "fuel adjustment clause" ("FAC") proceeding of $2.26 million in expenses incurred by Delmarva under long-term contracts for purchase of low-sulfur coal for production of electricity.

Delmarva appeals in part from that portion of the Court's decision which affirmed the Commission's disallowance of $1,158,572 of expenses incurred by Delmarva over three years of a five year contract with Continental Coal Company ("Continental contract") of Huntington, West Virginia. The Commission's disallowance was based on a finding that Delmarva's management was guilty of imprudence in negotiating a contract that included an "unprecedented" price escalator clause but failed to include a "market cap" on the price of the coal.

Delmarva also appeals Superior Court's affirmance of the Commission's disallowance of $111,840 in expenses incurred by Delmarva that were associated with a 1980 contract with the Avery Coal Company ("second Avery contract") of Philipsburg, Pennsylvania. The expenses that were disallowed represented the excess cost to Delmarva of purchasing coal in the spot market after Avery was unable to meet its contract requirements due to labor strife. The Commission again found Delmarva to have acted imprudently in electing to waive its contract right to require Avery to make up its strike-interrupted deliveries at a time when the spot market price for replacement coal was lower than the Avery contract price.

The Commission appeals from that portion of the Court's decision which reversed the Commission's disallowance of $990,826 of Delmarva's expenses incurred under a second contract entered into with Avery in 1980. The Commission cited Delmarva for

imprudence in failing to "bargain hard enough" over the price of the coal and in agreeing to pay three dollars more per ton than, in the Commission's view, it should have paid.

The underlying legal issue is the Commission's authority to impose on a public utility in an FAC expense proceeding a higher burden and different standard of proof than that imposed in an ordinary rate case. Finding the Legislature to have conferred such authority upon the Commission, Superior Court ruled that Delmarva's burden of proof was not met simply by its proof of a legitimate expenditure and the Commission's failure to find it to have been the result of waste, inefficiency or bad faith, the established standard for a rate case. *Application of Wilmington Suburban Water Corp.*, Del.Supr., 211 A.2d 602, 608–609 (1965), *aff'g* Del.Super., 203 A.2d 817, 836 (1964).

Having discerned a legislative grant of authority to impose a higher standard of review of an FAC application, the Court found it necessary to define (or redefine) that higher standard by which the Commission is to review FAC expense applications. With some difficulty, the Court fashioned as the proper standard of review of a public utility's fuel adjustment application the standard of prudence required of a trustee to its *cestui que trust*.[1] Invoking a trust concept of prudence to judge Delmarva's FAC application, the Court ruled that Del-

marva was required to establish not simply the reasonableness of a claimed FAC expenditure at time of occurrence, but also its reasonableness in the light of future events that should be reasonably foreseeable. In the Court's view of FAC expense claims, a public utility should be held to the same standard of skill and caution required of a trustee to the beneficiaries of an express trust, with the degree of skill and caution required to be "commensurate with the magnitude of the risk." As applied to long-term contracts for purchase of fuel for electric power, the Court defined the applicable standard as follows:

> This standard requires that the utility know what skillful persons knowledgeable in the area of fuel purchases should know and that it act to recognize and guard against potential problems. It is not chargeable with predicting future events but it is charged with foreseeing those problems which skillful persons might reasonably anticipate and, in the exercise of caution, protect against their consequences.

*Application of Delmarva Power & Light Co.*, Del.Super., 486 A.2d 19, 26 (1984).

■ Superior Court then applied to the hearing record what it found to be the Commission's correct standard of review of Delmarva's FAC application. And the Court made new findings of prudence and

---

1. The Court thereby applied to public utility law the "prudent man" statutory rule in Delaware controlling trustees of express trusts. 12 *Del.C.* § 3302. The Court did so to adopt the law of trusts' more precise definition of prudence and to invoke its three traits: reasonable care, skill and caution. The Court stated:

> The law of trusts offers two additional traits of prudence which find application—skill and caution. At a minimum, fiduciaries are required to "exercise the judgment and care under the circumstances then prevailing which men of prudence, discretion and intelligence exercise in the management of their own affairs." 12 *Del.C.* § 3302; *In Re Cook's Trust Estate*, Del.Ch., 171 A. 730 (1934); *Wilmington Trust Company v. Coulter*, Del.Supr., 200 A.2d 441 (1964). A trustee who holds

himself out as having greater skill than that of a person of ordinary prudence will be judged in light of that superior skill. *In Re Killey's Estate*, Pa.Supr., 457 Pa. 474, 326 A.2d 372, 375 (1974); Restatement (Second) of Trusts § 174 (1959). The element of caution is also coupled with the trustee's duty of reasonable care. *Union Nat. Bank of Wilmington v. Wilson*, Del.Ch., 25 A.2d 450, 454 (1942); *In Re Cook's Trust Estate, supra; Wilmington Trust Company v. Coulter, supra.*
> *Application of Delmarva Power & Light Co.*, Del. Super., 486 A.2d 19, 25–26 (1984). Neither party entirely agrees (and Delmarva disagrees) with the Court's borrowing of the law of trust's definition of prudence as the appropriate standard for the Commission to review FAC expense applications.

imprudence with respect to each of the contested expense allowance claims.[2]

We reverse for error of law by Superior Court (and the Commission) in the construction and application of the Delaware statute controlling fuel adjustment rate applications, 26 *Del.C.* § 303(b). We find the Court to have erred in several respects: *one,* in finding a legislative intent that a public utility's FAC expenses to be recoverable are subject to a different and higher standard of review than its ordinary operating expenses; and *two,* in then making new findings of what FAC expenses to allow and to disallow rather than permitting the Commission to perform its legislatively-mandated function of so finding, through remand.

 We hold the Commission's standard of review of an FAC application and the utility's burden of proof thereunder to be no different than the standard of review and burden of proof controlling a public utility's application for approval of its ordinary operating expenses in a rate adjustment hearing under section 303(a). Thus, the Commission is required to allow Delmarva's applied-for FAC expenses that are found to be lawful and proper and not the result of waste, inefficiency or bad faith.

As will be seen, inefficiency in this context is not synonymous with imprudence, as the Hearing Examiner and the Commission found. (See part III, below.)

## I

 The purpose of a fuel adjustment clause is to permit a public utility company to pass through to its customers increases or decreases in the cost of fuel without resort to the regulatory review process typical of rate proceedings generally. Fuel adjustment clauses have been a common feature of electric utility rate schedules since the middle of the 1920's.[3] Delmarva had initiated a fuel adjustment clause as early as 1918, when its predecessor began passing through to its industrial customers a "coal charge." By 1962, Delmarva had extended its fuel adjustment pass-through charges to all rates and customers. Originally, fuel adjustments were passed through to customers monthly; but since 1978, fuel adjustments have been processed by the Commission on an annual basis.

On October 30, 1981, Delmarva filed its application for increase in 1982 of its electric fuel clause adjustments, to become effective January 1, 1982. The Office of Public Advocate ("OPA") moved to intervene. The OPA objected to the increase, charging that Delmarva had contracted to pay excessive prices for fuel consumed at a recently constructed coal-fired generating unit of its Indian River station. The Commission referred the matter to a Hearing Examiner; and this litigation resulted.

## II

For an understanding of the objections that were raised to Delmarva's 1982 FAC application, it is necessary to recount some

2. Neither party has argued that Superior Court thereby exceeded its review function and preempted the role of the Commission as factfinder. Having found the Commission to have erred as a matter of law in applying the wrong standard of review, we think the Court should have returned the case to the Commission to make new findings of fact with respect to the contested claims. *See* 26 *Del.C.* § 510(c); 29 *Del.C.* § 10142(d); and *Application of Wilmington Suburban Water Corp.,* Del.Supr., 211 A.2d 602, 605 (1965).

3. Annotation: Validity of "Fuel Adjustment" or Similar Clauses Authorizing Electric Utility to Pass on Increased Cost of Fuel to its Customers, 83 ALR 3d 933, 935, § 2(a) (1978):

A major problem in public utility regulation concerns the simplification of the rate-making process, consistent with the duty of regulatory commissions to maintain supervision of utility rates. The simplest and most widespread solution has been the use of automatic rate adjustments, allowing rates to vary without formal proceedings in proportion to increases or decreases in a utility's operating expenses. The most common of such clauses, the fuel adjustment clause in electric utility rate schedules, became a recognized and widely accepted method of utility rate making by the middle of the 1920's. To date, the vast majority of electric utilities use fuel adjustment clauses.

history at Delmarva's Indian River facility. We borrow liberally from both the Hearing Examiner's report and the decision of Superior Court.

In 1972 Delmarva decided to increase its electrical generating capacity at Indian River by adding a large new unit to its existing coal-burning units. The new unit would generate 400 megawatts and would cost $200 million. Because of the rapidly increasing cost of imported oil and uncertainty as to its availability, Delmarva decided to build a coal-fired plant. The plant would consume between 800,000 and 900,000 tons of coal per year. By all estimates, it was a large undertaking.

If the plant were fueled by high-sulfur coal, Delmarva would be required to purchase and install costly air scrubbers to comply with the Environmental Protection Agency's (the "EPA") air quality performance standards. If the plant were designed to burn low-sulfur coal, known as "compliance coal", Delmarva would be exempted from the EPA regulations and would avoid the expense of costly scrubbers. Delmarva elected to burn compliance coal in its new plant.

In the meantime, with the coming of the 1973-74 Arab oil embargo, the price of all types of coal doubled. This, coupled with the impact of the EPA's requirements of low-sulfur dioxide emissions, heightened the demand for compliance coal as major utilities and the steel industry shifted away from oil to coal. By then, Delmarva had also concluded that to be assured a dependable supply of compliance coal for its new plant, two-thirds of its annual tonnage should be obtained under long-term contract, with the balance through the spot market, or shorter term contracts.

Delmarva had extensive experience in procuring high-sulfur coal, but none in procuring compliance coal. Since the supply of high-sulfur coal had always exceeded demand, Delmarva's past practice had been to procure its high-sulfur coal needs in the open or spot market. Recognizing its lack of "know-how" in the procurement of low-

sulfur coal, Delmarva in 1975 retained an outside consulting firm, Gilbert Associates, to assist Delmarva in planning for its compliance coal procurement. Some months later, Delmarva, seeking in-house expertise in coal procurement, hired the individual who had been assigned by Gilbert Associates to advise Delmarva on its coal procurement program.

To further assist Delmarva in its search for compliance coal suppliers, Delmarva in 1977 retained another outside consulting firm, the John T. Boyd Company. At the time there was little concrete market data on the availability and pricing of compliance coal. As the Commission itself concluded, in 1977 "the compliance coal market was in a state of confusion, and [represented] a seller's market."

With Boyd's assistance, Delmarva screened approximately eighty potential suppliers of compliance coal for coal reserves, quality, volatility, transportation costs and ultimate price. Boyd's expertise has never been questioned; whereas the individual Delmarva hired away from Gilbert was found by the Hearing Examiner, the Commission and Superior Court to have had limited experience in negotiating compliance coal contracts.

With Delmarva's coal-fired plant scheduled to become operational in 1978, Delmarva in 1977 entered into the five year contracts for compliance coal with the Continental and Avery companies that are the subject of this litigation. Under each contract, Delmarva was committed to purchase annually 300,000 tons of compliance coal; but under each contract, Delmarva achieved a measure of flexibility by reserving the right to adjust its annual tonnage commitment either upward or downward by between ten and twenty percent.

In this Court, the principal point of the dispute between the Commission and Delmarva is over the Continental contract's pricing provision. We quote the Hearing Examiner's Report in part:

In 1976 and 1977 compliance coals were generally considered to be in limited supply and the market for such coal was not well understood since few, if any, utilities were burning compliance coal. [Delmarva] entered into contract negotiations and in view of the unpredictable escalation in market prices due to inflation, decided to protect itself by using a cost of production escalation clause whereby price changes were based on changes in the cost of production of the coal itself and not on price escalation unrelated to cost [of coal]. This approach was used in the 1977 contract with the Avery Coal Co. and requires an audit of Avery's books to determine its production costs.

In the 1977 Continental contract [Delmarva] chose a different escalator clause based on Consumer Price Index (CPI) and Wholesale Price Index (WPI) to protect itself against a rapid rise in price of compliance coal due to excessive demand. [Delmarva] felt the CPI and WPI indices would escalate at a rate lower than compliance coal ... and their thinking was that the use of two different kinds of escalator clauses was good because it is difficult to project what escalators are going to do.

Avery started shipping coal in the latter part of 1978 and most of the shipments were not up to contract specifications. After repeated failure of Avery's coal to meet contract terms, [Delmarva] terminated the Avery contract in November 1979....

In November 1979 Continental began shipping coal [and the following month Delmarva] began a new search for coal suppliers to replace Avery and also as a possible replacement for Continental when its contract expired. One hundred and twenty four invitations for bids were sent out which produced thirty nine responses.

In January 1980 [another] outside consulting firm in the coal field was engaged by the Company to evaluate the five potential suppliers which had survived screening of the thirty nine bidders. Avery was not included in the bid list in view of its prior poor performance but Avery submitted a bid of its own volition. [The consultant] recommended certain details be supplied by Avery before its bid was to be considered and Avery submitted a revised bid in March 1980. Test shipments from Avery were received for several months which turned out to be satisfactory to Delmarva and in view of the fact that Avery's price was lowest, [Delmarva] signed a new three year contract with Avery on September 12, 1980.

### III

We now return to Delmarva's FAC application to recover its fuel expenses. The Hearing Examiner framed the question presented as being: whether Delmarva had been "prudent and efficient in its coal procurement activities" and "prudent and efficient in asserting its legal rights under the contracts." To reach a standard of disallowance of Delmarva's fuel adjustment costs based on inefficiency or imprudence, the Examiner employed the following reasoning: the Commission may disallow *ordinary* operating expenses of a utility that are either "made in bad faith or out of an abuse of discretion." *Application of Diamond State Telephone Co.*, Del.Super., 103 A.2d 304, 319 (1954), *aff'd in part, rev'd in part*, Del.Supr., 107 A.2d 786 (1954), *on rehearing*, Del.Supr., 113 A.2d 437 (1955). The term "abuse of discretion" is synonymous with imprudence; and imprudence is equivalent to inefficiency. Hence, *any* expense item of a utility, whether ordinary or FAC, found to be either imprudent or inefficient should be disallowed. As will be seen, we find this reasoning to be flawed.

Applying this standard of review to Delmarva's application, the Examiner found Delmarva's operating procedures to be imprudent or inefficient in numerous areas, only five of which remain pertinent to the issues on appeal: Delmarva's failure to have in 1979–80 a written policy on compli-

ance coal procurement; Delmarva's failure to have on its payroll in the mid-70's "more skilled contract negotiators"; its inclusion in the 1977 Continental contract of a coal price escalation clause based on the use of general indices of consumer and wholesale prices and its exclusion of a market cap; and lastly, Delmarva's waiver of Avery's contractual obligation to deliver strike-interrupted coal tonnage in 1981. The Examiner recommended disallowance of approximately $4.7 million of Delmarva's coal purchase expenses incurred under its contracts with Continental and Avery.

On rehearing, the Commission agreed with the Examiner that prudence and efficiency were the proper standards of review of an FAC expense application, and that the terms were synonymous.[4] However, the Commission, realizing the need to relate its standard to its statutory authority to review FAC applications, 26 *Del.C.* § 303(b), justified its standard by resort to 26 *Del.C.* § 308. Under 26 *Del.C.* § 308, authority is conferred on the Commission to consider "the efficiency, sufficiency and adequacy" of the facilities, products and services of a public utility.[5] Since section 303(b) speaks of the "need for a change in the fuel adjustment," the Commission then read into section 303(b) a standard of review of waste, inefficiency or imprudence. The Commission reasoned, "[t]here is no 'need' to pass on to customers costs which are the result of waste, inefficiency or imprudent activity by management."

However, the Commission disagreed with the Examiner over the application of a prudence test to Delmarva's fuel cost applica-tion. Adopting some, but not all, of the Examiner's findings, the Commission found that Delmarva had been "less than prudent and less than efficient" in nine specific respects:

(1) Failure to have a written coal procurement policy (4–1 vote);

(2) Failure to be more flexible in a changing market (unanimous vote);

(3) Failure to have more skilled and knowledgeable negotiators (4–1 vote);

(4) Failure to get more current cost information on the Avery Coal Company (unanimous vote);

(5) Failure to obtain reserve commitments from Avery before execution of the second Avery contract (4–1 vote);

(6) Failure to know of the other prices Avery received for its coal (unanimous vote);

(7) Proposal of an unprecedented escalator in the Continental contract negotiations (unanimous vote);

(8) Failure to secure protection against excessive price increases in the Continental contract (unanimous vote); and

(9) Waiver without consideration of a right to insist that coal not delivered in 1981 by Avery be made up (unanimous vote).

The Commission also disagreed with the Examiner over how many of these adverse findings could be translated into costs to be disallowed; and the Commission ultimately reduced the Hearing Examiner's fuel ex-

4. The Commission relied upon a dictionary definition of efficiency as, "an ability to choose and use the most effective and least wasteful means of doing a task or accomplishing a purpose ... in the best possible manner." Webster's *Third New International Dictionary,* Unabridged.

5. The subtitle of section 308, "Service as a factor in the Commission's regulation of a public utility," suggests that the focus of section 308 is predominantly upon the services of a public utility and that the term "efficiency" as so used does not connote "prudence." Nevertheless, the Commission found the term useful when trans-ferred and read into section 303(b) to connote prudence. That "efficiency" or "inefficient" is not synonymous with "prudence" or "imprudent" in the context in which those terms are used in section 308 seems apparent from the following provision of section 308: "If the Commission finds that the public utility's facilities, products or services are inefficient, insufficient or inadequate, it may impose such penalty upon the public utility as may be necessary to restore such facilities, products or services to a state of efficiency, sufficiency or adequacy."

pense disallowances from $4.7 million to $2.26 million.

Delmarva appealed to Superior Court; and Superior Court affirmed in part and reversed in part the Commission's disallowances. The Court affirmed the Commission's disallowance of a portion of Delmarva's 1977 Continental contract expenses; and the Court affirmed in part, but reversed in part, the Commission's disallowances with respect to Delmarva's two contracts with Avery. The Court thereby reduced the Commission's disallowance of Delmarva's fuel costs from $2.26 million to $1.27 million.[6]

With respect to the Commission's standard of review of an FAC expense application, the Court agreed with the Commission that Delmarva's FAC expenses should be held to a higher standard of scrutiny than its expenses in a regular rate case hearing. However, the Court found the Commission's standard of "prudence" both too imprecise and not sufficiently strict. The Court also reached this result on reasoning quite different from the Commission's. The Court implicitly found within section 303(b) a legislative intent to impose on the management of a public utility a trustee's standard of prudence for allowance of any expenses sought through an FAC application. This requires us to focus upon 26 *Del.C.* 303(b), enacted into law by the Delaware General Assembly in May, 1976 as 60 *Del.Laws*, chapter 431.

### IV

The 1976 session law is entitled, "An Act to Amend Section 303 ... to Require Public Hearings on Applications to Change the Fuel Adjustment Rate." The legislation was the Delaware General Assembly's response to the economic shock waves of the Arab oil embargo of 1973–1974. The legislative impetus is evident in the Act's preamble:

> WHEREAS, customers of the Delmarva Power and Light Company have been shocked at the large increase in their electric bills caused by application of the special Fuel Adjustment Clause; and
>
> WHEREAS, the Fuel Adjustment Clause has been applied by the said utility with only pro forma approval by the Public Service Commission, without benefit of the adversary proceedings normally required for rate changes; and
>
> WHEREAS, such hearings are necessary so that the public may know of impending changes in utility rates and may offer evidence.

The substantive provisions of the session law as originally adopted remain unchanged to date in section 303(b) of Title 26. The section provides in pertinent part:

> The Public Service Commission shall require all utilities operating within its jurisdiction to produce evidence at a public hearing of the need for a change in the fuel adjustment as a part of the ratemaking procedure.... As in other applications before the Public Service Commission, the burden of proof that the fuel adjustment change is required shall be upon the utility. No change in the fuel adjustment shall be authorized by the Commission except by affirmative vote of the majority of all members appointed to the said Commission. The Commission shall consider the evidence for and against the proposed change as it would all evidence in any other rate-making procedure.

**6.** The Superior Court affirmed the Commission's disallowance of $1.158 million of fuel costs incurred by Delmarva under its Continental contract; and the Court also affirmed the Commission's finding that Delmarva exercised imprudence under its first Avery contract in waiving Avery's requirement to make up its deliveries of coal that were interrupted by a labor strike, resulting in a disallowance of $.111 million. However, the Court rejected the Commission's findings that Delmarva had exhibited imprudence in negotiating the second Avery contract (by failing "to bargain aggressively") and that Delmarva had been imprudent in accepting coal from Avery that had a volatility rating of eight percentage points below the contract's specification.

The Commission found within this language a legislative intent to change the law as to fuel adjustment applications in two significant respects: *one*, to impose on a public utility seeking to pass through to its rate-paying customers its fuel-related costs a "special obligation" to minimize such costs; and *two*, to confer on the Commission (at least in an FAC adjustment proceeding) the authority and duty to require management to "justify" such costs as having been "prudently and efficiently" incurred.

On appeal, Superior Court essentially confirmed the Commission's construction of section 303(b). The Court concluded that the language of section 303(b):

> strongly suggests a departure from the standard of normal acceptance applicable to ordinary and less volatile operating expenses. Thus, it is not sufficient for the utility merely to demonstrate that the fuel expense was incurred but that it was *justified* under the circumstances.

*Application of Delmarva Power and Light Co.*, Del.Super., 486 A.2d 19, 24–25 (1984) (underlining added). As previously noted, the Court concluded that "justified" was synonymous with "prudent."

However, the Court, finding the Commission's definition of prudence to be "difficult ... both to define and apply", *id.* at 25, proceeded to fashion its own standard of prudence for judging a utility's section 303(b) FAC expense application. The Court did so in the following manner. It read into section 303(b) the law of trusts' statutory definition of prudence as applied to the trustee of an express trust under 12 *Del.C.* § 3302. The Court's legal premise for applying trust principles to utility law is its perception of the existence of a fiduciary relationship between a public utility and its customers, arising from the grant to a public utility of an exclusive franchise.[7] The Court also resorted to trust law for pragmatic reasons—to expand the Commission's review standard of FAC expenses to incorporate traits of prudence beyond that of "reasonableness." The Court concluded that, as to fuel-related expenses, the management of a public utility should be required to exercise the special skill and caution required of a trustee. The Court then applied its trustee concept of prudence to Delmarva's contested fuel expenses and made independent findings as to whether each contested category of expense had been "prudently and efficiently incurred" by Delmarva's management.

## V

As we see the questions on appeal, they are: (1) Does the 1976 enactment of section 303(b) evidence a legislative intent to confer on the Public Service Commission substantially broader authority to review an

---

7. Superior Court's authority for finding a trust relationship to exist between a public utility and its customers is apparently limited to dicta found in *City of El Dorado v. Arkansas Public Service Commission*, Ark.Supr., 235 Ark. 812, 362 S.W.2d 680, 683 (1963). Neither party has cited any other authority to support application of a fiduciary standard to a public utility management's relationship with its ratepayers. However, the United States Supreme Court took the contrary position nearly sixty years ago in *Board of Public Utility Comm'rs v. New York Telephone Co.*, 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926). There, Mr. Justice Butler, speaking for a unanimous Court, expressly rejected the characterization of the relationship between a public utility and its ratepayers as being in the nature of a trust, stating:

> The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary.

*See also Utah Department of Administrative Services v. Public Service Commission*, Utah Supr., 658 P.2d 601 (1983) ("*Wexpro II*"); and Comment, *Alice's Adventures in Wexproland: An Analysis*, 2 J. Energy L. & Pol'y 237 (1982). In the absence of an exceptional situation where the ratepayers may have a proprietary interest in property owned by a public utility, the general rule is that there is no trust relationship between a utility and its customers. *See Utah Department of Administrative Services v. Public Service Commission, supra*, 658 P.2d at 618, 619. Clearly, there is no case law precedent in Delaware for application of trust law legal principles to Delaware utility law.

FAC expense application than the review authority granted the Commission over rate proceedings generally; and (2) assuming an affirmative answer to (1), does the legislation authorize the Commission to judge a public utility's FAC expense application by the statutory standard that the Court of Chancery is directed to judge the action of a trustee of an express trust? Considering that the Commission is solely a creature of statute and is viewed more as a legislative than a judicial body, *Application of the Diamond State Telephone Co.,* Del.Supr., 113 A.2d 437, 446 (1955), we think the answer to both questions becomes self-evident.

We do not find within the 1976 enactment of section 303(b) a legislative grant of authority to the Commission: (a) to apply to an FAC expense proceeding under section 303(b) a different standard of review than the Commission's standard of review of the utility's operating expenses included within a rate case application under section 303(a); or (b) to impose on a public utility a greater obligation to justify fuel-related expenses than other operating expenses. Nor do we find a legislative intent to impose on a public utility a greater burden of proof for allowance of section 303(b) expenses than for the allowance of expenses in a rate case proceeding under section 303(a).

■ Finally, we do not find within the 1976 legislation any language even remotely suggesting a grant of authority to the Commission to make judgmental decisions as to the prudence of an FAC expense adjustment item. Clearly, no such authority existed in the Commission in reviewing a rate application under former section 303; and the General Assembly in its 1976 legislation simply redesignated section 303 as section 303(a). Hence, in our view, the hearing rules remain the same for both the Commission and a public utility in an FAC expense proceeding under section 303(b) as in an ordinary rate case application under section 303(a).

■ We construe the 1976 legislation to have one purpose and to be otherwise of limited scope. That purpose was to end the automatic pass-through of FAC expenses to rate-payers and to subject all further FAC applications to review by the Commission in adversary public proceedings, but otherwise under procedures no different from those applicable to a rate case application under restated section 303(a).

The title, preamble and body of the enabling act bear this out. The title of the session law speaks only to the requirement of a public hearing on applications for change of the fuel adjustment rate. The thrust of the preamble language of the legislation is directed to the need of subjecting fuel adjustment rate applications to the same adversary public hearing format "normally required for rate changes." The body of the statute does not reflect a legislative intent to alter the manner in which the Commission exercises its authority to review public utility expense applications. To the contrary, the statute's language fairly clearly evidences legislative intent that the manner in which a fuel adjustment rate change application is to be processed remains as with any rate application. We think the underlined portions of the statute reflect this intent:

> The Public Service Commission shall require all utilities operating within its jurisdiction to produce evidence at a public hearing of the need for a change in the fuel adjustment *as a part of the rate-making procedure.... As in other applications before the Public Service Commission,* the burden of proof that the fuel adjustment change is required shall be upon the utility.... The Commission shall consider the evidence for and against the proposed change *as it would all evidence in any other rate-making procedure* (underlining added).

The law is well settled and not disputed as to the standard of review of the Commission and the burden of proof of a public utility with respect to the allowance of a utility's expenses in a general rate case.

"In the context of a rate case, the Commission is required to allow a utility normally accepted operating expenses in the absence of a finding of waste, inefficiency or bad faith. *Diamond State Telephone Co.*, Del. Super., 103 A.2d 304 (1954); *Application of Wilmington Suburban Water Corp.*, Del.Super., 203 A.2d 817, 836 (1964), *aff'd*, Del.Supr., 211 A.2d 602 (1965)." [quoted with approval by the Court below, 486 A.2d at 24].

The 1976 legislation subjecting fuel adjustment applications to Commission review makes no change in the Commission's standard of review of a public utility's operating expenses in a rate case proceeding under section 303(a), formerly section 303. Hence, the Commission's standard of review of a public utility's operating expenses remains as limited as before, absent a finding of waste, inefficiency or bad faith in the incurrence of such expenses. This legal principle, but an extension of the business judgment rule of Delaware corporate law, is also premised on equally settled Delaware law that the statutory powers conferred by our General Assembly upon the Public Service Commission do not include the authority to "invade the province of the Boards of Directors of those utility corporations coming within its jurisdiction."

> Those matters constituting business judgment are for the Boards of Directors of the particular utility corporations to decide, not the Public Service Commission. Thus, the rule is that for rate-making purposes, a Commission must consider and allow the normally accepted operating expenses of a utility corporation *unless found to have been made in bad faith or out of an abuse of discretion.* *Application of Diamond State Tel. Co.*, Del.Super., 103 A.2d 304, 319 (1954), *aff'd in part and reversed in part on other grounds*, Del.Supr., 107 A.2d 786 (1954), *on reargument*, Del.Supr., 113 A.2d 437 (1955) (underlining added).

■ The Commission's standard of review of a public utility's expense application in an ordinary rate case hearing proceeding has never been construed as incorporating a judgmental standard of prudence, in the sense of permitting the Commission to involve itself in the business judgment of management. "[A] public utility commission shall not dictate business practices to be followed by a utility." *Application of Wilmington Suburban Water Corp.*, Del.Super., 203 A.2d 817, 829 (1964). The Commission's broad grant of statutory authority to set rates does not extend to the review of matters involving business judgment. In reviewing the operating expenses of a public utility, the Commission may not disallow "normally accepted operating expenses ... unless found to have been made in bad faith or out of an abuse of discretion." *Application of Diamond State Telephone Co.*, Del.Super., 103 A.2d 304, 319 (1954).

In more recent years, the standard of review of the Commission over ordinary operating expenses of a public utility has been stated in terms of requiring their allowance by the Commission "in the absence of a finding of waste, inefficiency or bad faith." *Application of Wilmington Suburban Water Co.*, Del.Supr., 203 A.2d 817, 835–836 (1964), *aff'd*, Del.Supr., 211 A.2d 602 (1965). However, we do not interpret the change in language from "abuse of discretion" to "inefficiency" to work any change in the applicable standard of review. In *Suburban*, this Court stated that the Commission was "required to allow legitimate expenses incurred by the utility during the test period. ... The allowance of such expenses does not call for the exercise of judgment by the Commission. Such legitimate expenses are allowed as a matter of course ... [including any] increase in expenditure ... provided it has not come about by waste or inefficiency." *Application of Wilmington Suburban Water Corp.*, 211 A.2d at 608, 609.

■ We agree with Delmarva that fuel procurement costs, whether sought to be allowed in a special proceeding under section 303(b) or in a general rate application

under section 303(a), constitute operating expenses. Hence, consistency requires that such fuel-related costs be subject to the same standard of review in an FAC adjustment proceeding as in a general rate application proceeding under section 303(a). Further, to read into section 303(b) a standard of prudence is, as previously noted, totally at variance with the Commission's well-defined and limited statutory authority to disallow operating expenses. Lastly, the Legislature's grant to the Commission of broad discretionary authority in the ultimate fixing of just and reasonable rates under section 303(a) should not be confused with the Commission's limited authority to disallow a public utility's incurred operating expenses. *Application of Diamond State Telephone Company*, Del.Supr., 149 A.2d 324, 328–329 (1959). For these reasons, the 1976 enactment of new section 303(b) must be construed as having a limited purpose: to bring FAC applications within the ambit of the Commission's well-settled review authority.

## VI

■ Since the FAC expense rulings of the Superior Court and of the Commission were based on application of erroneous review standards of prudence (variously defined), we must set aside all such rulings and direct Superior Court to remand the case to the Commission for the making of new findings based on the Commission's well-settled standard of review. Thus, the Commission is required to allow Delmarva's FAC expenses that were legitimately and properly incurred and which the Commission has not demonstrated (on the present record) to have resulted from waste, inefficiency or bad faith. We further conclude that inefficiency and waste are redundant terms; and that inefficiency is an inappropriate standard with which to measure an item of expense as distinguished from service of a public utility. Therefore, we restate the controlling standard for reviewing the operating expenses of a public utility to be: abuse of discretion, bad faith or waste. The Commission's

standard of review of an FAC expense application is no different than its standard of review of a public utility's ordinary operating expenses in a rate case application under 26 *Del.C.* § 303(a).

## VII

■ Finally, we briefly address one remaining issue between the parties: the controlling standard for judicial review of findings of fact of the Commission. Before the Superior Court and this Court, the parties disagree over whether the controlling statutory standard is that found in the Public Utility Act of 1974, 26 *Del.C.* § 510(c), or the Administrative Procedures Act of 1976, 29 *Del.C.*, chapter 101, § 10161. We affirm Superior Court's ruling that the review provisions of section 10161 supersede the comparable provisions of section 510(c) of the Public Utility Act of 1974 as to the controlling standard of judicial review of findings of fact of the Commission. The Administrative Procedures Act is clearly intended to control the standard and scope of judicial review of decisions of the Commission. 29 *Del.C.* §§ 10101 and 10161(3). *State, Dept. of Labor v. Minner*, Del.Supr., 448 A.2d 227 (1982). Thus, the "substantial evidence" rule found in 29 *Del.C.* § 10142(d), as defined in *Olney v. Cooch*, Del.Supr., 425 A.2d 610, 614 (1981), must be held to supplant the "sufficiency of the evidence" rule found in 26 *Del.C.* § 510(c). However, for present purposes, we do not find the two statutory standards to be materially different in application. *Olney v. Cooch, supra.*

\* \* \*

Reversed and Remanded.